This is a case that involves a very unusual set of circumstances. My client is a criminal defense attorney who represented a man named Brad Millward on two counts of homicide, and he, from our point of view, performed brilliantly in the case. And as a result of his representation of Mr. Millward, the jury, which heard all of this brouhaha concerning Mr. Gutierrez, returned a verdict of acquittal as to one count, and hung as to another count. Now, I'd like to say that if Mr. Millstein hadn't carried out the steps that he carried out in interviewing these witnesses, whom he were informed had relevant evidence to offer, that we might be appearing here today on the habeas corpus of Brad Millward, in which the issue would be the competency of Mr. Millstein as his trial attorney. At least that's my perspective. Confronted with information to indicate that jailhouse or inmate informant or witnesses, I should say, had testimony which was relevant, I don't see how anyone can dispute the fact that it was incumbent upon Mr. Millstein to interview these people. Now, of course, he's interviewing people who are obviously looking for something, and I think that cuts both ways. There seems to be no question that in the case of Mr. Gutierrez, had he been called by the prosecution during the Millward case, he would have been legally characterized as a jailhouse informant, which requires approval at the highest level in the district attorney's office, and it requires corroboration. Just as penal code 1111 requires corroboration, something which was never obtained in this case. And yet the defendants insist this day that they had corroboration, some mystical corroboration. That's the part that bothers the appellant and myself so much, because I believe it's an indication of bad faith. Having gone through an entire trial record, the Court of Appeal in California, examining the record, could not find any corroboration, because all of the testimony came from accomplice witnesses. And actually, only one accomplice witness was called against Mr. Millstein in his case, and that was Mr. Gutierrez. Mr. White testified that Mr. Millstein never asked him to lie. Mr. Haas was dead as of December of 89, and Mr. Myers has not been able to be located since the middle of 89. So the entire case against Mr. Millstein was based on the testimony of Mr. Gutierrez. Now, Mr. Cooley in his declaration and Mr. Fultz in our declarations have repeatedly stated that they approached Mr. Gutierrez in order to evaluate him as a witness and to determine whether or not he should be granted immunity. I don't think that the appellant is obligated to accept that, nor do I believe that a reasonable trier of fact is required to accept that interpretation. You're approaching a ten-time convicted felon who's admitted that he committed perjury, and instead of prosecuting the man, and the person who's approaching him is presumably the individual that will be in charge of deciding to arrest him, prosecute him, or what have you. Imagine the glee on the part of Mr. Gutierrez when he finds out that instead of prosecuting him, that they're actually there to decide one thing, and that is, is he going to cooperate with them in a prosecution against Mr. Millstein? How is that different from any other situation in which you have a cooperating witness who has some involvement in the crime? Well, this is a witness with ten felonies, Your Honor, ten felony convictions. Well, I mean, we see this all the time in drug cases, don't we? We've got a number of priors, someone who's been involved in the drug conspiracy thing. I mean, analytically, tell me why you think this is different from any other case and why. Because you're talking about prosecuting an attorney. You're talking about prosecuting an attorney based on accomplice testimony. And the attorney is unusually vulnerable to this type of a situation. I mean, any number of his clients could make claims if they thought they were going to gain some benefit out of it. And that's why I believe it's common modus operandi amongst law enforcement that you don't, in fact, I've previously stated that a police detective would never dream of bringing this case to a district attorney, would never dream of getting past closing out his file unless he had one of three or four things. One, in other words, to corroborate what this man said, one, typically they have a wire. They send the client into the attorney when you see these cases and he talks to the attorney and you record what the attorney is telling to the client or the witness and you listen in on it. Or secondly, you execute a search warrant of his office and perhaps you recover physical evidence to corroborate the statement. Or thirdly, you have a disgruntled former secretary who testifies against the attorney. Or fourthly, you intercept some type of conversations the attorney is having with the witness. Now, in this instance, there were a number of items that could have been pursued to corroborate the statements of Mr. Gutierrez. The phone records that were described or that were mentioned never pursued. Somehow, Mr. Milstein had to have been involved in a conversation with Mr. Gutierrez during this weekend interval between July 7th and July 10th because it's our position that Mr. Milstein had a two or three minute period of time to actually evaluate these invoices that we now know were phony and he had two or three minutes to evaluate them before Mr. Gutierrez retook the stand at the request of the prosecution. And, you know, obviously it would be unusual. You'd have to be thinking way ahead to conclude that the invoices were doctored or manufactured unless somebody told you that in advance. So the question was, how could Mr. Gutierrez tell Mr. Milstein in advance? And he comes up with this story, which is contradicted, that he either called him on his cell phone or called him at his house or talked to his fiancée or engaged in a three-way conversation from jail with Mr. Milward, all of which is highly improbable, but all of which could have been corroborated. They could have talked to the fiancée. They could have obtained the phone records. And you're talking about somebody who admits that he would sell out Mr. Milstein. He's very angry at the man because, in his opinion, he didn't represent him throughout his criminal proceedings, which, by the way, resulted in a total of four years out of a 15-year exposure, suggesting, in my mind at least, that he was angling for a deal, as they always do, and he got some kind of a deal. Mr. Raymond, can I, if I may for a moment, just direct you to the constitutional records at stake here we defined in Devereaux by looking at Pyle v. Kansas. And we said that in a case like this, the plaintiff needs to show that the defendants here, Cooley and Fulkes, continue their investigation of Milstein despite the fact that they knew or should have known that he was innocent or alternatively, another approach, another way of establishing a violation of the right would be to show that Cooley and Fulkes used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information. I gather that second prong, that's not your contention here at all. It's the first. Is that right? I don't concede either prong, Your Honor. Well, then what evidence – okay. Now, let's take the other statement. What evidence do you point to that shows that Cooley and Fulkes used coercive and abusive tactics? Well, I would analyze to the Devereaux facts. No, no. What evidence in this record on summary judgment do you point to that supports that? This is a summary judgment record, correct? All right. And you responded that Cooley and Fulkes filed a motion for summary judgment, submitted their declarations, and they pointed to the lack of evidence on your part. Now, I'm asking you what evidence do you point to? If you're going to – if your contention is that you can meet either prong, I'm asking you on this second prong, what evidence do you point to that shows that Cooley and Fulkes used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information? Well, I think this is a matter of considering the context in which Mr. Cooley approached Mr. Gutierrez. And this is why I would say let's look back at the facts in the Devereaux case where they had minor children being detained up to six hours. And let's remember that in the Devereaux case, the principal investigator in that case settled. So the result in Devereaux was regarding to some peripheral figures. And I contend that our case, Mr. Cooley and Mr. Fulkes were the principal investigators. Right. But what coercive tactics did they use? What they did in there was they, by detaining the minors and – No, no. No, no. No, no. It's his case. We understand Devereaux. Well, what would you expect? In other words, the question in Devereaux, the inference in Devereaux was that – I'm not interested – The tactic that they used was going to – they should have known it was going to produce false evidence, right? That was the whole point of that second prong. I think that's applicable here. Well, you just said that Cooley and Fulkes approached Gutierrez. They approached Gutierrez. Okay. What was coercive about that? It's going to produce false evidence. Just approaching him is going to produce false evidence. You're the prosecutor. You're the man that's going to charge him with perjury. He's already admitted that he's committed – Okay. So it's his status as the DNA. It's his status as the subject of a perjury case. Instead of actually prosecuting the man for perjury, which I would assume would be the logical thing to do, they cut a deal with the man in order to prosecute the attorney. Cutting a deal is somewhat different from coercion. Now, you just told us that you think Gutierrez had a grudge that he was out to get your client and so forth. That doesn't sound to me like the kind of coercion that we were talking about in Devereaux, in other words, in the totality of the circumstances. So what coercive tactic did the police use or the investigators use in this case? That is not physical coercion. It's an implication of a prosecution, Your Honor, if you're talking to somebody that you can prosecute for perjury. And instead of prosecuting them, they get the idea that if they cooperate with you, they don't get prosecuted. They get immunity and somebody else gets prosecuted. That's coercive. But what's the difference in the constitutional – in the sense we're talking about here? What's the difference between that and approaching any other witness in a conspiracy and trying to flip them? If we adhere to the rule of law, I think you're – or the rule you're proposing, then any time that someone is given immunity for their testimony in exchange for – given immunity for their testimony, then we have coercive tactics as a matter of law. I don't think we're going to go there. So I guess do you have anything else on coercion? We have to look at the facts of our case. We have to look at the facts of a man having committed perjury and admitted it and then being approached. It's not just a normal witness. Well, that seems to go to the first prong, proceeding despite the fact they knew that – they knew or should have known he was innocent. But do you have anything else to offer on the second prong? What technique was coercive here? The approach itself is my only argument on the first – on the second prong. The setting and the man that you're dealing with, that man is going to assume he's going to be prosecuted unless he cooperates. To me, you know you're going to get a false – you're going to get false evidence. If you didn't already know it based on his prior record and his history of flipping and flopping and going all over the map – to me, he obviously made up this whole story during the interview. If you look at the transcript of the interview, you can't possibly pin the man down on anything. So you don't – there's no technique that they used in the interview and no manner of approach you can point to. What you're just saying is that his record – the fact that they approached him at all and his record is what you rely on. They should have known they were going to be listening to lies. They should have known that. Okay. Doesn't that go to the first prong or the first test? It goes to the first prong. Okay. Why don't you talk about that? Well, on the first prong, Your Honor, we have a man who says he's going to sell out Mr. Milstein. He claims that he made a deal with Mr. Milstein in which Mr. Milstein apparently knows various judges in Los Angeles, is able to promise no time. I mean, to me, I would automatically disbelieve something like that. He says that Mr. Lucero was at his shop. He says he was not at his shop. Mr. Lucero, again, is not contacted. He says that – Now, at the time Cooley and Foltz interviewed Gutierrez, how much of what you just said did they know? They knew he had testified falsely. They knew that he had lied during the testimony. They knew that he had produced false invoices. He had established that during the trial. They knew he had either seven or ten felony convictions for dishonesty. And then you have to consider what he said during the interview itself, where he admits that he lies. He says that he was to be given representation at a reduced fee. Even though there's no evidence, he got a reduced fee. In fact, the evidence is to the contrary. You have about four minutes and 30 seconds left. Do you want to say that for rebuttal? And then, of course, he admits that he's ready to sell out the attorney. What does it take for common sense to have a place here? Just because they want to prosecute somebody, the suggestion is very strongly that Mr. Milstein was the victim of a retribution because of the outcome in the Millward case. Okay. Thank you. Good morning, Your Honors. May it please the Court. The plaintiff has alleged in his second amended complaint that the defendants are liable to him for conspiracy and for malicious prosecution. We know that as a result of the last Milstein case that this has now boiled down to three issues. The first allegation is that the defendants fabricated evidence by recruiting Mr. Gutierrez to recant his trial testimony given in People v. Millward and instead falsely claim that Mr. Milstein had solicited him to commit perjury. Well, the problem with that allegation is that the defendants could not have recruited Mr. Gutierrez to change his testimony because it was proven in People v. Millward that he lied. Mr. Ramey just admitted that. Mr. Gutierrez lied in People v. Millward when he said that Mr. Lucero had brought his car into the shop and that when Mr. Gutierrez fabricated the invoice. So when Cooley and Alexander went to Chuckawalla Prison in February 1990 to interview Mr. Gutierrez, they knew for a fact it was proven that Gutierrez lied about his story in People v. Millward. So they could not have gone there to get him to change his testimony he gave at People v. Milstein because everybody knew it was already a lie. Instead, what they did is they sat down with him and they said, what happened here? Well, that's when Mr. Gutierrez told his story. Now, why did Mr. Gutierrez want to tell this story against Mr. Milstein? Well, with the other two witnesses, with Mr. White and Mr. Myers, they had a motive that was derived from Mr. Millward. In other words, Millward allegedly offered White drugs and money when he got out of jail. Millward held a knife to Mr. Myers' neck and allegedly forced him to give a statement. But there's no evidence in the record that Mr. Millward coerced or induced Mr. Gutierrez to give false testimony. So why did he do that? Well, the link we have here is Mr. Gutierrez is also represented by Mr. Milstein in several criminal cases. Aside from the ethical concerns there, Mr. Milstein knows the defense theory of the case. The defense theory of the case is that Lucero's committed the murder. What do you need to help support that? Well, an invoice showing that Lucero had his car in Mr. Gutierrez's shop and Mr. Gutierrez saw ammunition that was consistent with the defense theory of the case, that would be helpful. Now, where did that come from? I'm not saying Mr. Milstein did it, but certainly there is an inference there. Do you think that there's a special rule for attorneys that ought to be made because they are in a vulnerable position in a situation like this that it's sort of tampering with the system maybe when you start prosecuting the attorneys? Well, I don't think there's a separate rule, Your Honor. I mean, the attorneys have certain ethical concerns and certain ethical things that they do, and there's attorney-client privilege and all that other stuff. But if a district attorney receives information that a criminal defense attorney, a district attorney, or any other lawyer has committed misconduct, I think there's an obligation there to investigate. If you look at the end of the transcript with Mr. Gutierrez's interview at Chuckawalla, there's some talk there about dirty DAs or dirty cops or something like that. And Mr. Cooley makes the interesting statement, I'm interested in the integrity of the justice system, period. And that's a paraphrase. But he's interested in all of that information, and so I don't think there's a separate rule. The second claim that Mr. Milstein makes here is that the defendants used his false statement from Mr. Gutierrez, again, taken in February 1990, and used that as a basis for filing a suit. Filing a crime report against him, listing themselves as complaining witnesses or crime victims. Well, first of all, the timing's all wrong. This investigation began on July the 5th, 1989, when Mr. Cooley wrote a memo, not a report, not a crime report, a memo, to Tom Alexander, a district attorney's investigator. He asked Mr. Alexander to interview Deputy DA John Portillo and Sergeant Gil Parra of the Los Angeles County Sheriff's Department, the reason for the request for the interviews was that Portillo and Parra had gone to Mr. Cooley, the head deputy DA at the time, and said, look, we have this information from a guy named Charlie Hawks, who said that Mr. Milstein asked him to falsely testify at Nolwar's criminal trial. That's undisputed. There is no evidence submitted by plaintiff to refute the fact that this is what Parra and Portillo were told. And so the investigation began on July the 5th, 1989, when Mr. Cooley wrote a memo, not a report, not a crime report, a memo, to Tom Alexander. And then Parra and Portillo also mentioned that they interviewed Myers and White, and they gave information implicating Milward, and White also gave information suggesting that after Milward asked him to testify falsely, Mr. Milstein visited him in prison, gave him photos of witnesses, gave him preliminary knowledge on the part of Mr. Milstein, that Milward was involved in the fabrication of evidence with White. Now... When did the investigation begin of Mr. Milstein? I would say the investigation began July the 5th, 1989, when Cooley wrote the memo to Mr. Alexander. Mr. Alexander then wrote a request for an investigation. I think this is the so-called crime report that they're referring to. The request for an investigation is an internal document that Alexander wrote to his supervisor requiring him to get permission to begin the investigation. It was Alexander who listed Mr. Cooley as the complainant or the complaining witness. So all Cooley did was write a memo asking for an investigation. And all he asked for was to interview Parra and Portillo to record the information they had orally given to Mr. Cooley. So again, the investigation began July the 5th, 1989. By the time Guterres is interviewed in Chuckawalla in February 1990, some seven months has passed. So it's the cart before the horse. How could you have used Guterres's statement as the basis for filing the crime report when the alleged crime report was filed seven months before? This doesn't make any sense. Mr. Milstein admitted that he has never seen and is not aware of a crime report filed with the Attorney General's office or the DA's office. Now, the third allegation here is that the defendants then investigated this crime report. And here's where I think the Devereaux test comes in. And as Judge Pregerson noted in footnote four in his order granting defendants motion for summary judgment, the point is, despite filing two opposition briefs, never mentioned Devereaux, never mentioned Saussure. In spite of the fact that in granting in part and denying in part defendants motion to dismiss plaintiff's second amendment complaint, Judge Pregerson relied on Devereaux. Anyway, when we get to Devereaux, as the plaintiff has to allege, that the defendants knew or should have known he was innocent. I'm not sure what his evidence of that is, although, again, to quote Judge Pregerson in footnote four, the defendants also, I'm sorry, the court notes that the plaintiff filed two oppositions. However, neither opposition addressed the arguments raised in the defendants moving papers. Indeed, neither opposition has a single evidentiary citation. I think what I get of the theory is what he expressed today, that this is such an unreliable witness and had who had lied before, that the testimony was so fundamentally flawed that to proceed on the basis of the interview alone at least creates an issue, a tribal issue of fact, as to whether or not they knew or should have known that this information was false. I mean, that's the theory as I understand it. Considering the facts in this case, I don't think that the defendants had any evidence that they knew or should have known, most favorably toward them, of course, at this stage. A couple of things on that. Just because somebody has lied in the past doesn't mean they always lie. Second, it was provably false. Guterres' testimony in People v. Millward was provably false. In other words, that Lucero came into a shop because we know these invoices were manufactured several months after they were allegedly written. So we know Guterres lied there. So changing his testimony, what could he change it to? The only thing he could change it to is, that's not what happened. He didn't come into my shop, and I fabricated the invoices. Well, we know that's true. So there's no change there. Well, the real thrust of this seems to be that Guterres was a liar. He had all these felony convictions and has lied before. Well, without bootstrapping it, Mr. Guterres testified at a grand jury. He testified at the trial. In Millard v. Millward. In the Milstein case, yes. Judge Wyatt bound Mr. Milstein over in a preliminary hearing, and at the criminal case, Mr. Guterres testified in front of a jury, in front of Judge McLaughlin, and Mr. Milstein was convicted. Now, again, I'm not trying to bootstrap this, but at the People v. Milstein trial, evidence was brought out that Guterres was a liar, that he had felony convictions, that he was generally a bad guy, and that he had this motive against Mr. Milstein. He didn't like Mr. Milstein. All that stuff came out. The jury heard the evidence, and the jury decided that they believed Mr. Guterres. And also, Judge McLaughlin heard the evidence. He denied motions to dismiss. Well, then there was the next stage that you're not mentioning, where the appellate court found there was no evidence to sustain the conviction. Well, but that's a whole different thing from proving innocence. And that's what I think Mr. Ramey misses here, is that he's saying, well, because there was insufficient evidence, they must have known he was innocent. Well, if that was the case, then every time someone was acquitted, or every time someone had a conviction reversed on appeal, there'd be a lawsuit against the deputy district attorneys, because then you could argue, well, they should have known I was innocent, because look, a court subsequently found that there was an insufficient basis to prosecute me. That is not the test in Devereux. Let me just back up just one point. You said that in this trial of Milstein, Guterres testified, and ultimately the jury convicted Mr. Milstein. Doesn't that suggest that his whole argument that we heard here this morning, as Judge Thomas just reiterated, were on summary judgment. Doesn't that suggest that there might, looking at the evidence of the light, most favorable to the nonmoving party here, that that raises a genuine tribal issue of fact? Regarding the first prong of Devereux. I think I'm missing your point. If he testified, and the jury, criminal jury believed him, that supports the argument that the defendant did not know, nor should they have known, that Mr. Milstein was innocent. Well, as you said, just because somebody has lied in the past doesn't mean they're going to lie all the time. Now, what we say here is that there was, what happened here on summary judgment is that the court said there's no evidence, there are no genuine tribal issues of fact, and on what they produced is a matter of law. The defendant is entitled to judgment. Well, I'm just curious, in your comments about Guterres, whether that doesn't suggest, your comments in response to Judge Thomas's question, doesn't that suggest that there might be a genuine tribal issue of fact? No, because we have to look beyond Guterres. It wasn't just Guterres. But what else do we look at? We look at Charlie Haas, who reported to Parra and Portillo that Milstein asked him to lie. And again, we're not looking at can you convict somebody, because what Mr. Milstein says here is not that I was innocent, but they could not legally convict me. Well, that's not the standard we're looking at here. And Charlie Haas corroborates the fact that he was in prison, and after Millward induced him to lie, Mr. Milstein came to visit him in prison, showed him the photos, showed him the transcripts, and asked him if he got the piece of paper from Millward reciting his testimony. So there's more evidence here than just Mr. Guterres. And none of this evidence points to Mr. Milstein's innocence. None of it. And that's what plaintiff has to show. And again, Judge Fragerson said there is no evidence. And if you look at the motion and the evidence submitted as it is, there is no evidence demonstrating a genuine issue of material fact on whether or not the defendants knew or should have known that Mr. Milstein was innocent. Okay. The court in Mr. Ramey makes much of the fact that Cooley and Alexander, when they went to Chuckawalla, they just shouldn't have believed anything that Mr. Guterres said, because he was a liar. Well, he was a perjurer. I mean, we know that. That's true. But as you probably know from other courtrooms, many times people testify in court, and they aren't telling the truth. In fact, it's amazing how you can hear two different sides of the same story and lead you to believe that somebody is lying. But the court in Mr. Ramey makes much of the fact that Cooley and Alexander, when they went to Chuckawalla, they just shouldn't have believed anything that Mr. Guterres said, because he was a liar. And the only issue to me is whether there's a tribal issue of fact on whether or not they knew or should have known. And they start off with an investigation of a known perjurer. He gives a story that may or not be believable. Perhaps it is, perhaps it isn't. But at least it seems to me when you approach an interview with somebody who's already lied in court and not just perhaps a fudge of the facts, but just made-up testimony out of wholeness. And that you have to be somewhat cautious about then basing another prosecution on their statement. I mean, the only question is, is that enough of a tribal issue of fact that they proceeded in face of that knowledge based on what they heard at the interview? No, because even Mr. Ramey admits in his opposition excerpts of record, page 117, that Mr. Guterres is a liar. He's a liar. He's a liar. And I think that Milstein's knowledge of the recruitment could have been inferred from the facts of this case. In other words, Milstein had knowledge that one could infer that he knew what was going on. Well, if that's what Mr. Ramey is saying, that you can infer that from Mr. Milstein, then Cooley and Foltz also could have inferred that. And the other thing is that it wasn't a prosecution just based on Mr. Guterres. Now, I understand that the court of appeal reversed the conviction based on the insufficiency of the evidence, but the prosecution proceeded on the belief that it had corroborating evidence from Mr. White and from other tangible evidence. Now, ultimately, the court found that it was wrong, and again, that goes to the sufficiency of the evidence, but not as to whether defendants should have known that Mr. Guterres was such a liar that they could never, ever get a jury to believe that. I understand your point on that. I think we're at a different stage, though, of course, with summary judgment. So the question is, as a matter of law, should they have been thrown out on all of their theories, given the facts? And that's a little harder hurdle for you, I think, at this point. Well, I would quote... I mean, the corroborating evidence you're talking about is not corroboration of Guterres' testimony. It's corroboration of the fact that there was perjury testimony at the trial, right? Right. Well, the test is, as the court knows, that the defendants had to know, or should have known, that Mr. Milstein was innocent. Not that they couldn't convict him, that he was innocent. Now, I don't see any evidence in the opposition, other than I didn't do it, that suggests that Mr. Milstein was innocent and, more importantly, that the defendants knew he was innocent, yet went forward with their investigation. There was plenty of evidence here for a reasonable person to believe that Mr. Milstein was involved in perjury. Whether he was or not is not the issue. It's whether or not one could have a reasonable belief that he was involved. Plaintiff has a high burden here. He has to prove that these defendants knew or should have known he was innocent. There's no evidence of that. And the fact that one of the witnesses, even the main witness, was a convicted perjurer and had this criminal record does not mean that they should have discounted his testimony. In fact, I'll quote from Devereaux, where the court said interviewers must be given some latitude in determining when to credit witnesses' denials and when to discount them. And when, and we are not aware of any Federal law that indicates precisely where the line must be drawn. So there is no law that required Cooley and Foltz to listen to Mr. Gutierrez and say, this guy's an inherent liar, we could never believe anything he said. Another point quickly is that Mr. Milstein's criminal investigator interviewed Mr. Gutierrez after Cooley and Foltz did. And this is important for one reason. If there was a time for Gutierrez to say, you know what, these guys coerced me or I lied to them and they should have known it because of this, that, or the other thing, that was the time. But instead, Mr. Gutierrez told Milstein's criminal investigator the exact same story. That he told Cooley and Foltz. And again, that testimony was admitted at trial and the jury believed Mr. Gutierrez and found him guilty. So to simply say Gutierrez was a liar, you have to say, well, the judge was duped and the jury was duped. Well, or that they relied on other evidence. Well, but the court said, the court of appeals said there was no other sufficient evidence. So obviously it was Mr. Gutierrez who carried the ball, carried the day in People v. Milstein. And because that was insufficient, there was no conviction. No one ever said that Mr. Gutierrez lied in People v. Milstein when he told the real story as to what happened. Again, the jury believed him, Judge McLaughlin believed him, we have to give deference to those two. Thank you for your argument. I'll briefly point raised by Judge Reed. You know, the United States Department of Justice has a regulation that when this kind of scenario comes up, that the prosecutor handling the case against the defense attorney has to hand off the subsequent case against the attorney. When there is one, to another attorney in the office, so that you don't end up with a situation like this that just smacks of retaliation. And that's what it smacks of here. This case is about inferences. It's not about hard evidence. An inference is a kind of less than a presumption. And the question here in my mind is, was Mr. Milstein entitled to any inferences from the evidence that was presented? Let me read to you a quick quotation from a seminal case in this circuit that is incited in the brief, Smitty v. Varney, the second decision by Judge Preggerson, the elder, at 803 F. 2nd, 1469. And the pinpoint site is 1469, is set 1472. Quote, the prosecutor has a duty to measure the facts in the report by legal standards and decide whether they add up to probable cause to prosecute. The possibility of less than perfect investigative conduct on the part of the police, and here the prosecutor is the police, is no doubt one reason the law requires an exercise of the prosecutor's informed discretion before the initiation of prosecution. Here we have someone who is a prosecutor, but who is being judged by the standard of a police officer. And here's the inferences to which I think Mr. Milstein are entitled. The testimony against Milstein occurred after the interview taken by jury 6, 1990. At the time of the interview, and I'm reading from page 9 of the opening brief, the time of the interview Gutierrez altered his previous testimony, and he was coached and prodded by defendant Cooley. I think that based on the tape recording and what went on in that interview, Mr. Milstein is entitled to that inference that there was prodding and coaching. By defendant Cooley as demonstrated by the tape and the recorded interview, although portions of the interview were not recorded, the tape was turned on and off at crucial times. What inference do you get from that? You get an inference of monkey business, of inappropriate conduct. At the time of the statement to defendant Cooley, Gutierrez's version of events was provably false and required corroboration as was well known to defendant Cooley. Then jumping to page 24 of the opening brief, the case against Milstein came down to the testimony of Alberto Gutierrez, who flip-flopped completely after being approached by defendant Cooley on February 6th. Now what inference is Mr. Milstein entitled to as a result of that interview? That a DA went in there, took somebody who was known to be as dirty as dirty could be, and got him to do something that he shouldn't have done. I think that's the key inference in this case, and it's an inference to which Mr. Milstein is entitled and which gets him by summary judgment. Unless there are any questions, I have nothing more to say. Any questions from the panel? Thank you for your argument. Thank you. And good luck in making your appearance. I'll be back Wednesday.
judges: Thomas, Paez, Reed